## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER GANCZARSKI

Plaintiff,

v.

OLLIE'S BARGAIN OUTLET, INC.,

Defendant.

No. 3:19-CV-1723

(Chief Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 20, 2022

Plaintiff Jennifer Ganczarski took a job with Defendant Ollie's Bargain Outlet, Inc. as an assistant manager. She was later promoted to store manager of the Scranton, Pennsylvania branch of Ollie's. Ollie's continually reviews its store managers' performance, evaluating their stores' compliance with Ollie's standards through a system of operational assessments. Ganczarski struggled as manager of the store and the assessments reflected her poor performance.

After Ganczarski's store failed two consecutive assessments, she took leave pursuant to the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") due to preexisting health conditions. Ollie's approved her leave and extended it on her request. About twenty days after her return, Ganczarski's store underwent another assessment, and again failed. Ganczarski was subsequently terminated from Ollie's.

Ganczarski now brings this employment discrimination action against Ollie's. She sues for several violations of federal and state law arising from her termination. But all Ganczarski marshals in her favor is the fact that she was fired about twenty days after she returned to work from FMLA leave. That is insufficient to raise the inference of discrimination. Nor does it establish any causal link between Ganczarski's termination and any of her protected characteristics or activities. Moreover, Ollie's maintains that it fired Ganczarski for her poor performance, namely her store's repeated failures on the operational assessments for which she is responsible as manager—an argument that Ganczarski fails to rebut. Therefore, Ollie's Motion for Summary Judgment will be granted.

## I.       BACKGROUND

### A.       Ganczarski Begins Her Employment at Ollie's

In December 2016, Ganczarski applied for a Co-Team Lead position in Ollie's Scranton store, which she received.[1] She was later promoted to a Store Team Lead of the Scranton store in May 2017.[2] Store Team Leads manage their designated stores and are accordingly responsible for "all aspects of financial and operational results, merchandising, associate development, and customer service."[3]

---

[1]   Doc. 32-1 at 8 (Ganczarski Dep. 42:1-8).
[2]   *Id.* at 10 (Ganczarski Dep. 52:4-25).
[3]   *Id.* at 20 (Ganczarski Dep. 69:13-21); *see also id.* at 75-76 (Ex. 5, Store Team Lead Job Description).

2

Ganczarski was hesitant to take on the role.[4] She cited as concerns staffing issues, the high volume of merchandise coming into the Scranton store, and her perceived lack of support from management.[5] But she accepted the position anyway for its increased pay. Upon accepting, Ganczarski signed a document indicating that she felt "comfortable completing the tasks associated with each area of responsibility assigned to store managers."[6]

Ganczarski began training with her soon-to-be supervisor, Lucas Guise, on Ollie's procedures.[7] One aspect of her training was Ollie's use of Operational Risk Assessments ("ORAs"), which are continuing evaluations of a store's compliance with Ollie's protocols—and a "critical part of the store manager role."[8] ORAs were performed in each of the first three quarters of the year by an Ollie's loss prevention team member, which was James Stayer for the Scranton store.[9] Stayer also trained Ganczarski on the ORA process.[10] Additionally, Ganczarski, as store manager, was responsible for performing less intensive weekly ORAs of her store to anticipate areas that required improvement.[11]

---

[4]   *Id.* at 11-12 (Ganczarski Dep. 53:12-54:9).
[5]   *Id.* at 12 (Ganczarski Dep. 54:10-55:4).
[6]   *Id.* at 21 (Ganczarski Dep. 70:6-17), 77-78 (Ex. 6, Job Skills Checklist—Team Leader).
[7]   *Id.* at 15 (Ganczarski Dep. 63:2-9).
[8]   *Id.* at 15 (Ganczarski Dep. 63:10-21), 197-98 (Stayer Dep. 22:23-23:11).
[9]   *Id.* at 198-99 (Stayer Dep. 23:12-24:7).
[10]  *Id.* at 200-202 (Stayer Dep. 37:22-39:21).
[11]  *Id.* at 199 (Stayer Dep. 24:8-18).

To pass an ORA, a store must receive above a ninety-percent aggregate score.[12] Anything below eighty-five percent aggregate score was a failure.[13] If a store failed, another follow-up ORA would be completed within thirty days, unless the store scored between eighty-five and ninety percent, in which case the manager would need to devise an action plan to improve performance, but there would be no follow-up ORA.[14] The next ORA would not assess anything that happened preceding the prior ORA, i.e., if a store failed an ORA on the first of the month, the follow-up ORA would not consider anything that happened on or before the first.[15]

An ORA tests five different areas: operations, internal risk, external risk, human resources, and safety.[16] The aggregate score is calculated by comparing the points earned to the points possible in each area.[17] The first ORA for a new store manager was considered a "training ORA" and did not count against them.[18] But if a store received three consecutive failing ORAs, the store manager would be terminated.[19] The ORA results were sent to the Ollie's human resources department, which would in turn determine the appropriate level of discipline.[20] Ollie's also used

---

[12]   *Id.* at 203 (Stayer Dep. 69:9-13).
[13]   *Id.* at 203 (Stayer Dep. 69:9-13).
[14]   *Id.* at 203-04 (Stayer Dep. 69:14-70:4).
[15]   *Id.* at 217-18 (Stayer Dep. 115:9-116:3).
[16]   *Id.* at 79 (Ex. 9, June 30, 2017 ORA).
[17]   *Id.* (Ex. 9, June 30, 2017 ORA).
[18]   *Id.* at 204-05 (Stayer Dep. 70:16-71:10).
[19]   *Id.* at 221-22 (Stayer Dep. 124:15-125:8); Doc 37-2 at 21 (Guise Dep. 49:3-19).
[20]   Doc. 37-2 at 21 (Guise Dep. 49:9-19)

performance reviews, but the ORAs were the primary consideration for managerial performance.[21]

## B.    The First ORA

Ganczarski's store received its first ORA on June 30, 2017, about six months after she began working for Ollie's and one month after her promotion to manager.[22] Her store's aggregate score was sixty percent, indicating a failure.[23] The ORA found Ganczarski's store to be "noncompliant" in twenty-four different areas, including the fact that the store was behind in unloading merchandise, merchandise was not marked with price tickets, loose price tickets found inside and outside the store, merchandise was not safely displayed, and merchandise blocking several fire extinguishers.[24] But this ORA did not count against Ganczarski, as it was her first as manager.[25]

Normally, the loss prevention team member would sit with the store manager to go over the results with them.[26] This was to allow Ganczarski to create a plan to improve the store's performance, which was largely her responsibility, save any issues that required approval from Guise, such as hiring management staff.[27]

---

[21]   *See id.* at 22 (Guise Dep. 54:25-56:8).
[22]   *Id.* at 24 (Ganczarski Dep. 92:7-19).
[23]   *Id.* at 24 (Ganczarski Dep. 92:20-25), 79 (Ex. 9, June 30, 2017 ORA).
[24]   *Id.* at 26 (Ganczarski Dep. 96:9-14), 86 (Ex. 9, June 30, 2017 ORA).
[25]   *Id.* at 205 (Stayer Dep. 71:11-17).
[26]   *Id.* at 26-27 (Ganczarski Dep. 96:15-24), 206-07 (Stayer Dep. 76:22-77:29). Ganczarski does not specifically recall whether she had such a conversation following the first ORA. Stayer maintains that he always had a conversation with a store manager following an ORA, whether in person or by phone. *See id.*
[27]   *Id.* at 26-27 (Ganczarski Dep. 96:25-97:13).

### C.   The Second ORA

Ganczarski's store received its second ORA on August 4, 2017.[28] The store again failed, this time with an improved, yet still deficient, aggregate score of eighty-two percent.[29] Compared to its first ORA, Ganczarski's store received a much higher score in operations, internal risk, external risk, and human resource, but a lower score on safety.[30] However, the operations and safety scores were the lowest of the five.[31] Additionally, there were twelve noncompliance issues, a decrease from the twenty-four found in the first ORA, but eight issues from the first ORA were identified again in the second.[32]

Ganczarski disputes some of the noncompliance issues noted in the second ORA but admits she has no reason to believe that any of the issues from the first or second ORAs were "fabricated."[33] She explains that in response to the failed ORA, she requested additional staff.[34] Guise recalls sending in in partial "support teams" to assist Ganczarski in managing the store from early on in her tenure as store manager.[35] But after November, Guise sent in "full teams" to assist the Scranton store for the holiday season.[36] Specifically, he sent in teams of six or seven people

---

[28]   *Id.* at 29-30 (Ganczarski Dep. 104:12-105:11), 87 (Ex. 10, Aug. 4, 2017 ORA).

[29]   *Id.* (Ganczarski Dep. 104:12-105:11), 87 (Ex. 10, Aug. 4, 2017 ORA).

[30]   *Id.* at 30-31 (Ganczarski Dep. 105:12-106:7), 87 (Ex. 10, Aug. 4, 2017 ORA).

[31]   *Id.* at 87 (Ex. 10, Aug. 4, 2017 ORA).

[32]   *Id.* at 31-32 (Ganczarski Dep. 106:11-107:21), 90 (Ex. 10, Aug. 4, 2017 ORA).

[33]   *Id.* at 33 (Ganczarski Dep. 112:5-12).

[34]   *Id.* (Ganczarski Dep. 112:13-25).

[35]   Doc. 37-2 at 37 (Guise Dep. 116:7-14).

[36]   *Id.* (Guise Dep. 116:7-14).

for a full day when the volume of merchandise in the store's storage area was so high that no additional merchandise could be brought into the store.[37] He also allowed Ganczarski extra payroll to accommodate additional staff-hours to move merchandise.[38] However, Ganczarski denies receiving any assistance.[39]

### D.   Ganczarski's Performance Review

Ganczarski had a yearly performance review on April 7, 2018, completed by Guise.[40] Guise explains that it is a "rule of thumb" that a reviewer would not grade an employee lower than "meets expectations" unless they had first received a "final writeup."[41] This enabled the review to facilitate a conversation on improving the employee's performance.[42] Aside from the second failing ORA—the first ORA to count against her—Ganczarski had not received any negative feedback at the time.[43]

Although Ganczarski received the evaluation in April, Guise prepared it in the second week of January and accordingly "d[id] [not] take into account anything after January."[44] The reason that Ollie's gave reviews to its employees in April was so they would coincide with annual wage increases.[45] Accordingly, the review covered

---

[37] *Id.* at 37-38 (Guise Dep. 116:20-117:11).
[38] *Id.* (Guise Dep. 116:20-117:11).
[39] *Id.* at 54 (Ganczarski Dep. 236:6-10).
[40] *Id.* at 21 (Guise Dep. 52:4-15); Doc. 32-1 at 96-98 (Ex. 13, Apr. 7, 2018 Ganczarski Performance Review).
[41] Doc. 37-2 at 21, 27 (Guise Dep. 51:11-20, 76:2-12).
[42] *See id.* at 21 (Guise Dep. 51:11-20).
[43] *Id.* (Guise Dep. 52:4-18).
[44] *Id.* (Guise Dep. 52:19-25).
[45] *Id.* at 50 (Guise Dep. 167:21-168:21).

both Ganczarski's time as a Co-Team Lead and as the Scranton store manager, but it also considered her ORA performance as manager.[46]

In her review, Ganczarski was found to "meet expectations" overall.[47] Specifically, Guise found Ganczarski met expectations in decision-making, being results focused, managing others, and customer service, but needed improvement in communication as well as planning and organizing.[48] The review further noted that "[t]here h[ad] been numerous multiple request emails and deadlines missed" as well as "several occurrences" when the store was behind on moving merchandise.[49] Elaborating on her communications issues at his deposition, Guise recalls several instances when he would visit Ganczarski's store only to come back two weeks later and find it in a "complete backtrack from the previous visit."[50] He further recalls that most of the times he walked into Ganczarski's store, it was a "911": the aisles were "badly merchandised for the customers," and the "backroom [was] overflowing with a truck on the way."[51]

Guise explains that Ganczarski failed to communicate that she needed assistance, sometimes misrepresenting the state of affairs at the Scranton store.[52] But

---

[46] *See id.* at 21 (Guise Dep. 50:24-51:10), 50 (Guise Dep. 166:5-167:20).
[47] *Id.* at 21 (Guise Dep. 52:16-17).
[48] Doc. 32-1 at 97 (Ex. 13, Apr. 7, 2018 Ganczarski Performance Review).
[49] *Id.* (Ex. 13, Apr. 7, 2018 Ganczarski Performance Review).
[50] Doc. 32-7 at 25 (Guise Dep. 65:15-66:14).
[51] *Id.* (Guise Dep. 67:5-20).
[52] *Id.* at 25-26 (Guise Dep. 67:22-69:10).

he acknowledges that the store had staffing issues.[53] He recalls responding to those issues by sending in several managers and support teams to assist the Scranton store.[54] Stayer similarly recalls support teams and managers going to the store to assist.[55] He also explains that it was company policy to have fill-in managers present when the store manager could not be, as a management-level employee was required to open and close the store.[56]

### E.    The Third ORA

Ganczarski's store received its third ORA—the second to count against her—on March 30, 2018.[57] As Stayer recalls, the nine-month delay between the August 2017 ORA and this one was likely caused by the company's busy fourth quarter, which encompassed the winter holiday season, during which several new store openings required Stayer's presence.[58] On this ORA, the Scranton store failed with an aggregate score of seventy-seven percent, with failing sub-scores in operations, internal risk, and safety, as well as sixteen noncompliance issues.[59] Guise recalls sending in several teams of employees from other Ollie's stores as well as personally visiting the Scranton store himself to assist following this ORA.[60]

---

[53]  *Id.* at 26 (Guise Dep. 70:3-72:3).
[54]  *Id.* at 26-27 (Guise Dep. 72:3-73:20).
[55]  Doc. 32-1 at 212-15 (Stayer Dep. 89:21-92:4).
[56]  *Id.* at 215-16 (Stayer Dep. 92:5-93:21).
[57]  *Id.* at 91-95 (Ex. 12, Mar. 30, 2018 ORA).
[58]  Doc. 32-1 at 208-09 (Stayer Dep. 78:13-79:9).
[59]  *Id.* (Ex. 13, Mar. 30, 2018 ORA); *see id.* at 35 (Ganczarski Dep. 142:6-20); *id.* at 207-08 (Stayer Dep. 77:20-78:10); Doc. 37-2 at 29 (Guise Dep. 81:25-4).
[60]  Doc. 37-2 at 51-52 (Guise Dep. 172:20-175:8).

## F.     Ganczarski Takes FMLA Leave

Ganczarski requested and received FMLA leave on April 12, 2018, to address her generalized anxiety disorder and hypertension.[61] However, she did not explain that she was taking leave because she suffered from generalized anxiety disorder and hypertension; nor did she request any accommodations for those conditions.[62] Neither Stayer nor Guise was aware of her conditions or that she took leave pursuant to the FMLA.[63] On her further request, Ollie's extended her leave.[64]

On April 13, the day after Ganczarski took leave, Guise contacted her asking if she would be putting together an employee schedule and offering to have another store manager complete it.[65] Ganczarski refused and said she would complete the schedule herself.[66] She does not recall whether she completed the schedule.[67] During the week Ganczarski took leave, Guise recalls contacting her to schedule another ORA.[68] While Ganczarski was out, Guise recalls bringing in support teams to ensure that the storage area of her store was emptied for incoming merchandise.[69] The exact date is unclear, but Ganczarski returned to work on May 12 or 13, 2018.[70] She

---

[61]   *See* Doc. 32-1 at 102-03 (Ex. 17, Apr. 19, 2018 FMLA Ltr. from Nick Pawlush to Ganczarski), 106 (Ex. 18, Approved Leave Form).
[62]   *See* Doc. 32-1 at 36 (Ganczarski Dep. 174:2-19).
[63]   *Id.* at 220-21 (Stayer Dep. 123:24-124:14); Doc. 37-2 at 27-28 (Guise Dep. 76:13-77:22).
[64]   Doc. 32-1 at 37 (Ganczarski Dep. 185:12-16).
[65]   Doc. 37-5 at 199 (Ganczarski Dep. 334:12-335:8)
[66]   *Id.* at 199-200 (Ganczarski Dep. 335:9-336:6).
[67]   *Id.* (Ganczarski Dep. 335:9-336:6).
[68]   Doc. 37-2 at 27-28 (Guise Dep. 76:13-80:22).
[69]   *Id.* at 48 (Guise Dep. 157:2-158:23).
[70]   Doc. 32-1 at 39 (Ganczarski Dep. 187:8-25).

returned to her role as the Scranton store manager at the same pay and with the same benefits.[71]

### G.    Ganczarski's Final Written Warning

Ganczarski received a final written warning from Guise on May 14, 2018, as a consequence of the three failed ORAs, only two of which actually counted against her.[72] Guise prepared the warning following the third ORA on March 30, 2018, but could not discuss it with Ganczarski then because she was already out on FMLA leave.[73] Guise claims it was company "policy" to issue a warning after a manager's second failed ORA.[74] He explains that the timing was likely the result of his schedule and other responsibilities as a district manager; Ollie's was opening new stores and assessing the inventory of its existing stores, both of which required Guise's presence.[75]

As for its content, the warning specifically referred to the ORA scores on the first, second, and third ORAs, explained that it was a final written warning, advising Ganczarski that "[f]urther performance issues" or "any violation of Ollie's policies w[ould] result in [her] termination."[76] Ganczarski acknowledged that the warning was her last and that further violations could result in her termination, but she refused

---

[71]  *Id.* at 42-43 (Ganczarski Dep. 195:20-196:4).
[72]  *Id.* at 125 (Ex. 25, Final Writeup).
[73]  Doc. 32-7 at 34-35 (Guise Dep. 104:25-105:5).
[74]  *Id.* at 35 (Guise Dep. 106:20-107:6).
[75]  *Id.* (Guise Dep. 107:6-108:6).
[76]  Doc. 32-1 at 125 (Ex. 25, Final Writeup).

to sign the document when Guise gave it to her.[77] She argues that her performance improved when she was fully staffed and her failing scores were primarily the result of staffing issues.[78] Although both Stayer and Guise referenced a "three-strikes" policy when it came to failing ORAs, the warning explains that Ollie's "may terminate an associate for any reason, with or without notice. Advance notice is not required, nor is there any requirement that Ollie's impose progressive discipline prior to termination."[79]

### H.    Ganczarski's Fourth ORA and Termination

The fourth and final ORA of the Scranton store during Ganczarski's tenure took place on May 30, 2018.[80] The store scored a seventy-four percent, three percent lower than the last ORA, with failing sub-scores in the same three categories, operations, internal risk, and safety, as well as sixteen noncompliance issues.[81] The ORA assessed only the conditions of the store following Ganczarski's return and therefore did not consider anything that occurred while she was on leave.[82] As with the other ORAs, Ganczarski agrees that all the noncompliance issues were "legitimate."[83]

---

[77]   *See id.* at 45 (Ganczarski Dep. 214:7-21), 125 (Ex. 25, Final Writeup).
[78]   *See id.* at 45-46 (Ganczarski Dep. 214:22-215:7).
[79]   Doc. 32-1 at 125 (Ex. 25, Final Writeup).
[80]   *Id.* at 126-30 (Ex. 27, May 30, 2018 ORA).
[81]   *Id.* at 49-50 (Ganczarski Dep. 228:24-229:4), 126-30 (Ex. 27, May 30, 2018 ORA).
[82]   Doc. 37-2 at 32 (Guise Dep. 94:9-96:9).
[83]   Doc. 32-1 at 50 (Ganczarski Dep. 232:5-14).

Guise could not recall another manager in his district who failed an ORA three times.[84] Stayer explains that he believed that there was a "reasonable opportunity" for Ganczarski to improve her scores from the day she came back from FMLA leave and the fourth ORA.[85] He further believed that the lack of assistant managers would not have been a mitigating factor for Ganczarski, as she was trained to complete the responsibilities for every employee.[86]

Ollie's terminated Ganczarski the following day, May 31, 2018.[87] The notice of her termination referenced the failing ORAs and the repeated issues found in each.[88] Stayer and Guise both maintain that they had no input into Ganczarski's termination, which was controlled entirely by Ollie's human resources department.[89] Stayer did share his opinion with the human resources department, however.[90] Ganczarski was replaced with Kevin Smith, a man who was then working at the Scranton store awaiting an assignment to be a store manager.[91]

## I.    Procedural History

Ganczarski filed suit against Ollie's alleging sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII") (Count I)

---

[84]    Doc. 37-2 at 50 (Guise Dep. 165:8-166:4).
[85]    Doc. 32-1 at 217-18 (Stayer Dep. 115:9-116:3).
[86]    *Id.* at 218 (Stayer Dep. 116:4-8).
[87]    *Id.* at 50-51 (Ganczarski Dep. 232:19-233:9); Doc. 32-1 at 131 (Ex. 28, Termination Notice).
[88]    Doc. 32-1 at 131 (Ex. 28, Termination Notice).
[89]    *Id.* at 196 (Stayer Dep. 19:20-25); Doc. 37-2 at 30 (Guise Dep. 87:16-88:8).
[90]    Doc. 32-1 at 195-96 (Stayer Dep. 19:20-20:10). It is unclear what Stayer's opinion was or to whom he expressed said opinion.
[91]    *Id.* at 234 (Smith Dep. 27:7-23), 237 (Smith Dep. 40:8-22).

and the Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.* ("PHRA") (Count II), disability discrimination under Americans with Disabilities Act 42 U.S.C. § 12101 *et seq.* ("ADA") (Count III) and the PHRA (Count IV), discriminatory retaliation under the ADA (Count V) and PHRA (Count VI), failure to restore to former employment in violation of the FMLA (Count VII), and retaliation in violation of the FMLA (Count VIII).[92] Ollie's now moves for summary judgment.[93] Its motion has been fully briefed and is ripe for disposition.

## II.    LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[94] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[95] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[96] Conversely, to survive summary judgment, a plaintiff must "point to

---

[92]   Compl. Doc. 1.
[93]   Def.'s Mot. for Summary Judgment, Doc. 32.
[94]   Fed. R. Civ. P. 56(a).
[95]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[96]   *Clark*, 9 F.3d at 326.

admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[97]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[98] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[99] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[100] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[101]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[102] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[103] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by

---

[97] *Id.*

[98] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[99] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[100] *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[101] *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[102] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[103] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[104] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[105]

## III.   ANALYSIS

The Court will first address Ganczarski's discrimination and retaliation claims (Counts I through VI and VIII), as they are all analyzed under the same burden-shifting framework espoused in *McDonnell Douglas Corp. v. Green*.[106] It will then discuss Ganczarski's FMLA interference claim (Count VIII).

### A.   *McDonnell Douglas* Burden-Shifting Framework

For claims of discrimination and retaliation under the FMLA, ADA, and PHRA,[107] courts apply different legal standards based on the type of evidence the plaintiff presents. Specifically, "claims based on circumstantial evidence" have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*.[108] Here,

---

[104] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[105] Fed. R. Civ. P. 56(c)(3).

[106] 411 U.S. 792 (1973).

[107] "The proper analysis under Title VII and the [PHRA] is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

[108] *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d Cir. 2012) (citing *McDonnell Douglas Corp.*, 411 U.S. 792; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-78 (1989) (O'Connor, J., concurring)).

Ganczarski does not appear to be alleging a mixed motive case.[109] Indeed, she relies purely on inferential evidence. Inferences are, by definition, circumstantial evidence.[110] Therefore, the *McDonnell Douglas* framework governs Ganczarski's discrimination and retaliation claims.

Under that framework, Ganczarski "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence."[111] The "central focus" of the *prima facie* case in this context "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"[112]

The parties only dispute whether Ganczarski can show a causal nexus between her protected activities or characteristics and her termination. To prove causation in the discrimination context, Ganczarski must "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."[113]

---

[109]  Plf.'s Opp. Br., Doc. 9 at 9 (applying the *McDonnell Douglas* analysis).

[110]  *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994).

[111]  *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).

[112]  *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

[113]  *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Sarullo*, 352 F.3d at 797 n.7).

Similarly, in the retaliation context, "[t]o establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing."[114]

If Ganczarski presents a *prima facie* case, the burden then shifts to Ollie's to "articulate some legitimate, nondiscriminatory reason for [her termination]."[115] Importantly, the shifting burden concerns only the evidentiary burden of production; "[Ganczarski] has the ultimate burden of persuasion at all times."[116] Specifically, Ollie's must "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."[117]

If Ollie's meets that burden, "the presumption of discriminatory action raised by the *prima facie* case is rebutted" and the burden shifts back to the Ganczarski.[118] To sustain her claim, "[Ganczarski] then must establish by a preponderance of the evidence that [Ollie's] proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."[119] Specifically, Ganczarski must "provid[e] evidence that would allow a fact finder reasonably to

---

[114] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[115] *Sarullo*, 352 F.3d 797 (citing *McDonnell Douglas*, 411 U.S. at 802).

[116] *Lichtenstein*, 691 F.3d at 302.

[117] *St. Mary's Honor Center*, 509 U.S. at 507 (internal quotation marks and emphasis omitted).

[118] *Sarullo*, 352 F.3d at 797 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

[119] *Id.*

(1) disbelieve [the company's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of [her termination]."[120]

### B.    *Prima Facie* Case

#### 1.    **Sex Discrimination (Counts I and II)**

As noted above, to present a *prima facie* case on her sex discrimination claim under Title VII and the PHRA (Counts I and II), Ganczarski must show that she "(1) is a member of a protected class; (2) was qualified for the position she held; (3) was fired from that position; and (4) suffered adverse action under circumstances that give rise to an inference of discrimination."[121]

Ganczarski was replaced by someone outside of her protected class, a male named Kevin Smith.[122] She argues that her replacement by a male establishes a *prima facie* case of sex discrimination. In support, she cites an unpublished decision from the United States District Court for the Eastern District of Pennsylvania that in turn cites a published decision from the United States Court of Appeals for the Eighth Circuit.[123] Both are Title VII cases involving sex discrimination claims, and

---

[120]  *Id*. at 800 (internal quotation marks and citation omitted).
[121]  *Johnson v. St. Luke's Hosp.*, 307 F. App'x 670, 671 (3d Cir. 2009) (citing *Jones*, 198 F.3d at 410-11).
[122]  Doc. 32-1 at 237 (Smith Dep. 40:8-22).
[123]  Plf.'s Opp. Br., Doc. 35 at 9 (citing *Gardner-Lozada v. SEPTA*, 2014 WL 6633195, at *9 (E.D. Pa. Nov. 24, 2014) (citing *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944-45 (8th Cir. 1994))).

both conclude that replacing a Title VII plaintiff with someone of a different sex is sufficient to show a *prima facie* case.[124]

The Court is skeptical that replacement by someone outside of the protected class alone is sufficient for a *prima facie* case. In the race discrimination context, also governed by Title VII, the Third Circuit seems to require more, specifically that the plaintiff's employer replace the plaintiff with an individual outside the plaintiff's protect class *and* "treat[] [the replacement] more favorably."[125] More favorable treatment of someone outside the plaintiff's protected class can assuredly raise the inference of discrimination.

Here, it is unclear whether Ollie's treated Smith more favorably than Ganczarski, as he also failed his first two ORAs but passed the rest.[126] Nonetheless, the Court will give Ganczarski the benefit of any doubt and conclude that she meets her light burden of showing a *prima facie* case of sex discrimination.

---

[124] *Davenport*, 30 F.3d at 944 ("While proof of replacement by a person outside the protected class will satisfy the fourth element, it is now well-settled that such proof is not required."); *Gardner-Lozada*, 2014 WL 6633195, at *9 ("Nevertheless, under the circumstances, the fact that SEPTA promoted male employees instead of [the female plaintiff] is enough to create a *prima facie* case of discrimination.").

[125] *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993) (emphasis added); *see also Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 214 n.3 (3d Cir. 2011) (rejecting a plaintiff's argument that replacement by an individual outside of her protected classes is independently sufficient to show causal nexus).

[126] *Id.* at 238-39 (Smith Dep. 51:11-52:15).

### 2. Disability Discrimination and Retaliation Claims (Counts III through VI)

Similar to the standard laid out above, to present a *prima facie* case of disability discrimination under the ADA and PHRA (Counts III and IV), Ganczarski needs to establish "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by [Ollie's]; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."[127]

As for her disability retaliation claims (Counts V and VI), Ganczarski must show (1) she engaged in "protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[128] As discussed below, with respect to both her FMLA and disability claims, Ganczarski fails to demonstrate a causal nexus between her FMLA leave or disability and her termination.

Ganczarski has no comparator evidence. She is unaware of or could not recall any disabled store managers who kept their jobs despite failing three consecutive ORAs.[129] Although the lack of comparator evidence is not fatal to her claims, she must present other compelling circumstantial evidence to establish a causal nexus

---

[127] *Taylor*, 184 F.3d at 306.

[128] *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

[129] Doc. 32-1 at 49 (Ganczarski Dep. 228:2-23).

between her termination and her disability as well as her taking leave for that disability.

To do so, Ganczarski relies on the twenty-one days between her return from FMLA leave and her termination and Ollie's failure to support her as a manager. She argues that this evidence supports her *prima facie* case as well as her pretext allegation.[130] However, none of her arguments raise an inference of discrimination once put into the factual context of this case.

As an initial matter, "[t]o the extent that [Ganczarski] relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, [s]he will have to show as well that the decision maker had knowledge of the protected activity."[131] She "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of [her] protected conduct at the time they acted."[132]

It appears that no one at Ollie's was aware of Ganczarski's anxiety or hypertension. Stayer was not.[133] Nor was Guise.[134] She never communicated her conditions to Ollie's HR personnel.[135] Nor did her leave request or doctor's note

---

[130] *See* Plf.'s Opp. Br., Doc. 35 at 9 (citing *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014)).

[131] *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citations omitted) (citing *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)).

[132] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015)

[133] Doc. 32-1 at 20-21 (Stayer Dep. 123:24-124:14).

[134] Doc. 37-2 at 27 (Guise Dep. 76:13-25).

[135] Doc. 32-1 at 36 (Ganczarski Dep. 174:6-16).

indicate her conditions or that she had a disability.[136] It appears that Guise was under the impression she took general "medical leave."[137]

Additionally, the FMLA allows employees to take protected leave for a variety of reasons,[138] so the mere fact that Ganczarski took FMLA leave would not put anyone at Ollie's on notice that she had a disability. Therefore, the temporal proximity between Ganczarski's termination and her taking leave for her disability cannot establish a causal link between the two.

Even assuming that Ollie's knew of her disability, twenty-one days is substantially longer than most periods considered sufficiently short to independently raise the inference of discrimination.[139] In any event, the Court must "review the whole record and not merely the length of time between protected activity and adverse action."[140] During the relevant period, the Court may "consider 'intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient

---

[136] *See id.* at 99 (Ex. 15, Ganczarski's Leave Request Form), 102 (Ex. 17, Apr. 19, 2018 FMLA Ltr. from Nick Pawlush to Ganczarski), 106 (Ex. 18, Approved Leave Form), 107 (Ex. 19, Doctor's Note).

[137] Doc. 37-2 at 27 (Guise Dep. 76:13-25).

[138] *See* 29 U.S.C. § 2612(a)(1) (listing the various reasons for which an employee can take FMLA leave).

[139] *See, e.g.*, *Lichtenstein*, 691 F.3d at 307 (seven days); *Jalil*, 873 F.2d at 708 (two days); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (three weeks); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (four days); *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (five days); *see also Harrison-Harper v. Nike Inc.*, 788 F. App'x 846, 849 (3d Cir. 2019) (concluding that three weeks was a "short period" but still insufficient to show causation in light of other circumstances disproving discriminatory motive).

[140] *Harrison-Harper*, 788 F. App'x at 849.

23

to support the inference of retaliatory animus,' but also relevant to the analysis is whether employment-related issues are documented *prior* to the protected activity."[141]

As to the timing itself, Ganczarski was well aware of Ollie's practice of doing another ORA in the thirty days following a failing ORA, having already gone through a follow-up ORA.[142] Her third failing ORA (but only the second that counted against her) took place on March 30, 2018, meaning it was likely—if not certain—that the store would undergo another ORA. But she took leave from April 12, 2018, to May 10, 2018. Upon her return, she was given twenty days until the next ORA.

Ganczarski points out that following her second failing ORA on August 4, 2017 (the first ORA to count against her), she was not assessed again for almost nine months, in violation of Ollie's purported policy requiring a follow-up ORA within thirty days. Ollie's responds that the holiday season and inventorying stores explains the delay.

But even taking an inference in Ganczarski's favor here, it is unclear how additional time to acclimate to the responsibilities of store manager prejudiced her. If anything, her failure to pass the same assessment after nine months is a stronger showing of her poor performance. And undisputed evidence indicates that Ollie's

---

[141] *Id.* (emphasis in original) (quoting *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

[142] *See* Doc. 32-1 at 126 (Ex. 25, Final Writeup) ("The policy for Operational Risk Assessment was reviewed with [Ganczarski] on 6/30/17, 8/5/17, and 3/30/17.").

vacillation from its follow-up-ORA policy was not specific to the Scranton store or Ganczarski. Stayer, who was responsible for doing the ORAs was occupied with the holiday season and completed no ORAs during that period for any store.[143] Aside from the timing, there is no suggestion of intervening animus related to Ganczarski's disability.

Ganczarski also points to the final warning given to her on May 14, 2018, only about two weeks before she was terminated. But she does not dispute that Guise was unable to give her the warning sooner because she had taken FMLA leave.[144] Indeed, Guise gave her the review the week she returned.

Ganczarski last argues that Guise and Stayer's self-serving assertions that her FMLA leave was not considered during the ORA process and the decision to terminate her cannot be the basis for summary judgment.[145] But it is her burden to show that there is a causal connection between her leave for disability and her termination, not the company's.

The Court finds the ORAs strong evidence of Ganczarski's poor performance prior to her FMLA leave. The first three ORAs described her consistent failures to follow Ollie's policies in detail, including her continuing failure to resolve issues in the operations, internal risk, and safety categories, as well as many of the same

---

[143]  *See id.* at 207-09 (Stayer Dep. 77:20-79:20).
[144]  Def.'s Statement of Undisputed Material Facts ("SUMF"), Doc. 33 ¶ 76; Plf.'s Resp. to Statement of Undisputed Material Facts ("RSUMF"), Doc. 37 ¶ 76.
[145]  Plf.'s Opp. Br., Doc 35 at 15.

noncompliance issues.[146] The last ORA, following Ganczarski's return, was no exception, with failing scores in the same three areas and similar noncompliance issues.[147] A pattern of consistent negative criticism both before and after Ganczarski took leave undermines any causal link between her leave and or disability and her subsequent termination.[148]

Ganczarski next argues that she was not given the necessary support to succeed and categorically denies Stayer and Guise's detailed recollections of the support they provided to the Scranton store.[149] But it is immaterial whether Ollie's provided Ganczarski with the support she desired because she has not established that Ollie's discriminated with respect to which managers it supported. She does not identify any managers who received the support that she desired. She does not dispute that as Scranton store manager, she was responsible for all aspects of the store's operation, staffing, and ORA compliance.[150] Nor does she not dispute that she was trained on all those aspects.[151] And to the extent she required Guise's approval with hiring assistant managers, she does not dispute that Guise "never delayed or held up the hiring process when [she] requested approval."[152]

---

[146]  *See* Doc. 32-1 at 87-90 (Ex. 10, June 30, 2017 ORA), 91-95 (Ex. 12, Aug. 30, 2017 ORA).

[147]  *Id.* at 126-30 (Ex. 27, Mar. 30, 2018 ORA).

[148]  *See Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000) (concluding that performance evaluations were not causally linked to protected activity where they "contained similar criticisms both before and after he made the company aware that he [was disabled] and before and after he [engaged in a protected activity]").

[149]  *See* Plf.'s Opp. Br., Doc. 35 at 13-16.

[150]  SUMF, Doc. 33 ¶¶ 17-18; RSUMF, Doc. 37 ¶¶ 17-18.

[151]  SUMF, Doc. 33 ¶¶ 12-15; RSUMF, Doc. 37 ¶¶ 12-15.

[152]  SUMF, Doc. 33 ¶ 20; RSUMF, Doc. 37 ¶ 20.

Aside from Ollie's seemingly justified concerns over her performance, Ganczarski does not present any evidence of antagonism, much less a pattern of it. For these reasons, the Court concludes that Ganczarski has not presented a *prima facie* case of disability discrimination or retaliation.

### 3.    FMLA Retaliation Claim (Count VIII)

To present a *prima facie* case of retaliatory discrimination under the FMLA, Ganczarski must show (1) she is protected under the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her exercise of her FMLA rights.[153] Her burden to show a causal nexus is lower on her FMLA claim is lower than her burden on her other claims—she need only prove that her use of FMLA leave was a "negative factor" in the company's decision to terminate her.[154] But even with that lower threshold, Ganczarski still fails to establish a *prima facie* case.

As an initial matter, the Court notes that its above analysis on Ganczarski's disability claims applies with equal force to her FMLA retaliation claim. Both claims share a factual predicate: Ganczarski took FMLA leave because of her disability.

Once again, Ganczarski again does not present any comparator evidence.[155] Additionally, as discussed above, the timing of her termination is not independently

---

[153] *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 151 (3d Cir. 2017).
[154] *Lichtenstein*, 691 F.3d at 301.
[155] Doc. 32-1 at 49 (Ganczarski Dep. 228:2-23).

unduly suggestive of discrimination, and she provides no additional evidence of discriminatory animus.

As for Ollie's awareness of the protected nature of Ganczarski's FMLA leave, although Guise was generally aware that Ganczarski took medical leave, he did not know that it was FMLA leave.[156] Ollie's HR personnel were obviously aware, as they approved her FMLA leave. Yet it is unclear who made the ultimate decision to terminate Ganczarski.[157] As noted above, Guise denies any involvement in that decision.[158]

But here Ganczarski faces a problem. She disputes Guise's assertion of noninvolvement, relying on Ollie's answers to interrogatories that identify Guise as a "decision-maker" and as a "person who participated" in the decision to terminate her.[159] Her dispute does not advance her cause. If Guise played a role in the decision to terminate Ganczarski, then one of the decisionmakers had no knowledge that Ganczarski took FMLA leave when Ollie's decided to terminate her. Therefore, Guise's involvement weakens any causal link between her FMLA leave and her termination.[160]

---

[156]  Doc. 37-2 at 27 (Guise Dep. 76:13-25), 31 (Guise Dep. 90:2-91:6).

[157]  *See id.* at 13 (Gusie Dep. 19:2-17).

[158]  *Id.* at 30 (Guise Dep. 87:16-88:17); Doc. 32-1 at 195-97 (Stayer Dep. 19:20-20:10, 22:6-18).

[159]  Def.'s Answers to Plf.'s Interrogatories, Doc. 37-5 at 3-4.

[160]  *See Harrison-Harper*, 768 F. App'x at 850 (affirming summary judgment in favor of employer where only "one of the four [decisionmakers] had any knowledge of [the plaintiff's] report of the purported harassment").

But even looking at the HR team alone and assuming Guise was not involved, the HR team approved Ganczarski's FMLA leave without question, and extended it without question. She identifies no act, remark, or practice that raises the inference of discrimination on their part either. Although Ganczarski raises a factual dispute here, the Court concludes it is not material and summary judgment is accordingly appropriate.[161]

### C. Legitimate, Non-Discriminatory Reasons

As discussed, under the *McDonnell Douglas* framework, now that Ganczarski has established a *prima facie* case of sex discrimination, the burden shifts to Ollie's to present evidence supporting a legitimate, non-discriminatory reason for her termination.[162] Ollie's asserts that it fired Ganczarski for her poor performance, namely her three consecutive failing ORAs. The Court is satisfied that Ollie's has met its burden to show a legitimate reason for Ganczarski's termination.

### D. Pretext

As Ollie's has met its burden, the burden shifts back to Ganczarski to show that Ollie's reason for terminating her—her poor performance—is pretextual. To do so, she must point to "evidence of inconsistencies and implausibilities in [Ollie's] proffered reasons for discharge which *could* support an inference that [it] did not act for nondiscriminatory reasons."[163] That said, "[t]he question is not whether [Ollie's]

---

[161] *See EBC*, 618 F.3d at 262.
[162] *Daniels*, 776 F.3d at 193 (2015).
[163] *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 205 (3d Cir. 1987).

made the best, or even a sound, business decision; it is whether the real reason is discrimination."[164] Ganczarksi is held to the "preponderance of the evidence" standard—that is, she must prove it is more likely than not "that [the company's] proffered reason was a pretext for discrimination."[165]

The analysis above on Ganczarski's disability discrimination claims applies in large part to her sex discrimination claims because she relies on the same evidence.[166] But that evidence is even less probative of sex discrimination than it is of disability discrimination or FMLA retaliation. She cannot anchor the timing of her termination, the final warning, or the ORAs to any action indicative of sex discrimination.

Furthermore, Ganczarski again fails to provide any comparator evidence beyond her replacement being a male.[167] During her deposition, she was asked to identify potential comparators. Specifically, she was asked to identify any male managers, non-disabled managers, or managers that did not take FMLA leave who also failed three consecutive ORAs yet kept their jobs at Ollie's.[168]

---

[164] *Willis v. UPMC Children's Hospital of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015) (citations omitted).

[165] *Parker*, 309 F. App'x at 555.

[166] *See* Plf.'s Opp. Br., Doc. 35 at 9 (referencing Ganczarski's evidence of pretext in her argument on her sex discrimination claim).

[167] Doc. 32-1 at 47-49 (Ganczarski Dep. 226:7-22). Guise recalled a store manager at a different store who was fired after three failing ORAs but could not recall whether she had received a performance review indicating that she met expectations. Doc. 32-7 at 27 (Guise Dep. 73:23-75:20).

[168] Doc. 32-1 at 47-49 (Ganczarski Dep. 226:7-22).

Ganczarski remembers "seeing" one such male manager whom she believed worked "near the Reading store."[169] Pressed further, she stated that she had the "feeling and interpretation" that there was a male manager who failed three consecutive ORAs based on "general conversations with different store managers at different times through [her] time with Ollie's."[170] By contrast, Guise recalls a female manager who was fired after failing her third ORA in 2010.[171]

Ganczarski was later asked to identify the "store managers who [she] believe[s] were treated more favorably, meaning they failed multiple ORAs consecutively and were not terminated."[172] She responded that she "know[s] males were favored more favorably in [Guise's] eyes and [Stayer's] eyes than females. So to answer that question, I can't give you a definite but I just know."[173] But Ganczarski's "generalized, subjective beliefs" that Guise and Stayer treated men more favorably "are insufficient to maintain an unlawful discrimination claim."[174]

Furthermore, Ganczarski does not dispute the ORA results, which indicate her continued poor performance in the role of manager.[175] Nor does she dispute that

---

[169] *Id.* at 48 (Ganczarski Dep. 226:19-227:9).

[170] *Id.* at 48 (Ganczarski Dep. 227:10-23).

[171] Doc. 37-2 (Guise Dep. 74:14-75:10).

[172] Doc. 32-1 at 55-56 (Ganczarski Dep. 237:24-238:4).

[173] *Id.* at 56 (Ganczarski Dep. 238:5-18).

[174] *Dinnerstein v. Burlington Cnty. College*, 764 F. App'x 214, 217 (3d Cir. 2019) (citing *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006)).

[175] SUMF, Doc. 33 ¶¶ 53-55, 64-66, 97-101; RSUMF, Doc. 37 ¶¶ 53-55, 64-66, 97-101.

ORAs are "a key aspect of [Ollie's] audit process and a critical part of [her] role" as store manager.[176]

As for the alleged inconsistency between her performance review and her subsequent termination, "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."[177]

Ganczarski does not dispute that the review considers both her performance as store manager and as a Co-Team Lead, the latter of which is not responsible for ORAs.[178] She also does not dispute that the review expressed that she needed improvement in areas directly assessed by the ORAs: ensuring that merchandise was moved from storage to the salesfloor and that the salesfloor was kept clear.[179] Nor does she dispute that Guise prepared the review in January, three months before her termination, and that that the reason the review was given in April—the month before she was terminated—was because April is when Ollie's gave its employees

---

[176] SUMF, Doc. 24 ¶ 20; RSUMF, Doc. 37 ¶ 24. Ganczarski also points to photos of her store that show compliance with Ollie's procedures. She suggests that these photos contradict Guise and Stayer's criticisms. Plf.'s Opp. Br., Doc. 35 at 15. In reviewing the photos, Guise recognizes most of them as his work or the work of the support teams he sent in; on others, he still has some critiques. *See* Doc. 37-2 at 38-43 (Guise Dep. 118:2-138:9). It is unclear how these photos contradict anything. Although she denies Guise ever helped her, Ganczarski does not suggest that the photos are her handiwork.

[177] *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992).

[178] SUMF, Doc. 35 ¶ 69; RSUMF, Doc. 33 ¶ 69.

[179] SUMF, Doc. 35 ¶ 72; RSUMF, Doc. 33 ¶ 72.

raises.[180] In this context, the review does not demonstrate the kind of inconsistency needed to demonstrate pretext.[181]

Moving on to the three-strikes ORA policy, even assuming that Stayer applied the policy inconsistently, was overly subjective in his assessments, or that the policy did not exist at all, Ganczarski provides no evidence to connect the policy's alleged failings to her disability beyond the timing of the ORAs, which the Court has already addressed. "[She] has the burden of casting doubt on [Ollie's] articulated reasons for [its] employment decision. Without some evidence to cast this doubt, this [C]ourt will not interfere in an otherwise valid management decision. To require less would be to expose to litigation every management decision impacting on a protected party."[182] The undisputed facts explain and contextualize the timing of each action Ollie's took. The timing alone cannot save her claims from summary judgment.

For similar reasons discussed in this section and above, Ganczarski fails to meet her burden to show pretext on her sex discrimination claims under Title VII and the PHRA (Counts I and II). Had she presented a *prima facie* case on Counts III (ADA disability discrimination), IV (PHRA disability discrimination), V (ADA retaliation), VI (PHRA disability retaliation), and VIII (FMLA retaliation), the Court

---

[180] SUMF, Doc. 35 ¶ 70-71; RSUMF, Doc. 33 ¶ 70-71.

[181] *Cf. Wyatt v. Nissan N.A., Inc.*, 999 F.3d 400, 425 (6th Cir. 2021) (concluding that poor performance review did not undermine causal link in discrimination action where employee's performance was exemplary).

[182] *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds by Hicks*, 509 U.S. 502.

concludes that she does not meet her burden to show pretext on those claims either. Therefore, summary judgment is appropriate on Counts I through VI and VIII.

### E.   FMLA Interference Claim (Count VII)

This leaves only Count VII, which alleges Ollie's failed to restore Ganczarski to her former position in violation of the FMLA. That claim is best understood as an FMLA interference cause of action.[183] "Unlike an FMLA retaliation claim, '[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.'"[184] Accordingly, "a *McDonnell-Douglas* burden-shifting analysis is not required."[185]

To make out a *prima facie* case of FMLA interference, Ganczarski must show (1) she was an eligible employee under the FMLA; (2) Ollie's was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to the defendant of his or her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA.[186]

At the outset, it does not appear that Ganczarski was denied any benefit under the FMLA. She was restored to the same position with the same pay and benefits. Of course, she was terminated shortly after. But the termination seems a more

---

[183] *See* 29 C.F.R. § 825.215 (requiring that employers place an employee who took FMLA leave in an "equivalent position"); 29 C.F.R. § 825.220(b) (equating any violations of federal regulations interpreting the FMLA as "interfering with . . . exercise of rights provided by [the FMLA]").

[184] *Capps*, 847 F.3d at 155 (alterations in original) (quoting *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005)).

[185] *Id.* (quoting *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006)).

[186] *Id.*

appropriate predicate for her retaliation claim than an interference claim. Even so, "the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."[187] Accordingly, "[Ganczarski] [can]not prevail on h[er] interference claim if [Ollie's] can establish that it terminated [her] for a reason unrelated to h[er] intention to exercise his rights under the FMLA."[188]

As discussed above, Ganczarski fails to establish a causal link between Ollie's decision to terminate her to her approved FMLA leave. Even if she could connect the two, case law suggests that termination that follows the restoration of an employee to their former position is grounds for a retaliation claim rather than an interference claim, although there is overlap.[189] As the Court concludes that Ganczarski was terminated for performance issues, it also concludes that Ollie's did not interfere with her FMLA rights by terminating her. Therefore, Ganczarski presents no genuine issue of material fact on her interference claim. Summary judgment is accordingly appropriate on Count VII.

---

[187] *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007).

[188] *Id.*

[189] *See Capps*, 847 F.3d at 150-51, 156 n.11 (affirming summary judgment for employer on employee's FMLA interference claim because employee was not denied any FMLA benefit after being terminated following approved leave).

## IV.   CONCLUSION

To maintain a claim of employment discrimination based on circumstantial evidence, a plaintiff needs to show that the alleged adverse actions were more likely than not motivated by discriminatory animus. Here, Ganczarski fails to do that. Ollie's offers legitimate, non-discriminatory reasons for its decisions to terminate her, namely her consistently poor performance as store manager. Based on the summary judgment record, the Court finds that these reasons are likely genuine— that is, they are not offered as a pretext for discrimination. Accordingly, Ganczarski's claims of discrimination do not survive summary judgment, as well.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge